# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 14-1108V
Filed: March 7, 2017

```
* * * * * * * * * * * * * * * * *
SUZANNE FUHRI, Representative of    *       UNPUBLISHED
the ESTATE of T.F.,                 *
                                    *
            Petitioner,             *       Encephalopathy; Death; Diphtheria-
                                    *       Tetanus-Acellular Pertussis Vaccine
 v.                                 *        ("DTaP"); Table injury; Dismissal
                                    *        of Table claim only
SECRETARY OF HEALTH                 *
AND HUMAN SERVICES,                 *
                                    *
            Respondent.             *
* * * * * * * * * * * * * * * * *
```

*Edward Kraus, Esq., Law Offices of Chicago Kent, Chicago, IL, for petitioner.*
*Adriana Teitel, Esq., US Department of Justice, Washington, DC, for respondent.*

## PARTIAL RULING ON ENTITLEMENT[1]

On November 13, 2014, Suzanne Fuhri ("Ms. Fuhri" or "petitioner") timely filed a petition for compensation on behalf of the estate of her minor child, T.F., under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] ("Vaccine Act" or "the Program"). The petition alleged that T.F. suffered an acute illness following administration of diphtheria-tetanus-acellular pertussis ("DTaP"), haemophilus influenza type B ("Hib"), inactivated polio ("IPV"), pneumococcal, and hepatitis B vaccines on November 29, 2012, which led to his death on December 1, 2012. Petition ("Pet."), ECF No. 1 at 1. Petitioner also alleged that T.F. suffered the Table injury of acute encephalopathy "within an hour of his vaccinations

---

[1] Because this unpublished ruling contains a reasoned explanation for the action in this case, I intend to post this ruling on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, § 205, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2012)). In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to delete medical or other information, that satisfies the criteria in § 300aa-12(d)(4)(B). Further, consistent with the rule requirement, a motion for redaction must include a proposed redacted ruling. If, upon review, I agree that the identified material fits within the requirements of that provision, I will delete such material from public access.

[2] The Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 *et seq.* (hereinafter "Vaccine Act" or "the Act"). Hereafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

that lasted until his death 36 hours later, which meets the requirements of a table injury for the DTaP vaccine. 42 U.S.C. § 11(c)(1)(C)(i)." *Id*. at 4.[3]  Lastly, petitioner alleged that the vaccines were the cause in fact of T.F.'s death. *Id*.

In cases involving an injury on the Vaccine Injury Table ("Table"), petitioners are presumed to be entitled to compensation.  If a petitioner did not experience a Table injury, he or she can pursue a claim based on causation-in-fact, in which petitioner must demonstrate by preponderant evidence that the vaccine in question caused the injury alleged.

In this matter a fact hearing addressing whether T.F. experienced a Table encephalopathy was held on October 19, 2016, in Chicago, Illinois.  Ms. Fuhri, Brian Fic, Sr., Brian Fic, Jr., Joseph Fic, and Steven Fic submitted affidavits on October 6, 2016, and testified at the hearing. Robert Fuhri and Angelica Fic submitted affidavits on October 6, 2016, but did not testify at the hearing.

Having carefully considered the medical records, affidavits, investigation reports, and testimony, I find that petitioner has not presented preponderant evidence that T.F. suffered from a Table encephalopathy following receipt of the vaccines on November 29, 2012.  Accordingly, petitioner's Table encephalopathy claim is hereby DISMISSED.  However, petitioner's causation-in-fact claim is unaffected by this Partial Ruling on Entitlement.

## I.  Procedural History

Petitioner filed her petition on November 13, 2014.  Pet., ECF No. 1.  This case was originally assigned to Special Master Dorsey.[4]  On December 15, 2014, petitioner filed 11 exhibits.  Pet. Ex. 1-11, ECF No. 9-10.  A Statement of Completion was filed on January 6, 2015.  ECF No. 11.

On January 9, 2015, respondent filed a status report ("Resp. S. R.") requesting that petitioner file "the police report generated by Officer Bryan following his interview of the family and communications with hospital staff."  Resp. S. R., ECF No. 12, at 1.  An Order was entered requiring the filing of the requested documents and an Amended Statement of Completion by February 9, 2015.  Order, issued Jan. 9, 2015, ECF No. 13.

On February 9, 2015, petitioner filed a motion requesting an additional 21 days to file the outstanding records, which was granted.  Order, issued Feb. 10, 2015, ECF No. 15.  On February 24, 2015, petitioner filed the police report and an Amended Statement of Completion.  Pet. Ex. 12, ECF No. 16-17.  On April 27, 2015, respondent filed a Rule 4(c) Report ("Rule 4 Report") stating that compensation was not appropriate.  ECF No. 20.  Following a Rule 5 conference held on May 14, 2015, an Order was entered for the filing of petitioner's expert reports.  Order, issued May 18, 2015, ECF No. 21.

---

[3] While all of the vaccines received by T.F. are listed in the Vaccine Injury Table, only the DTaP that T.F. received is associated with the Table Injury of "encephalopathy."

[4] Special Master Dorsey was elevated to Chief Special Master on September 1, 2015.

On June, 3, 2015, petitioner filed the expert report of Dr. Douglas Miller.  Pet. Ex. 13-14, ECF No. 22.  Following a Motion for Extension of time, respondent filed two expert reports and medical literature by compact disc on October 20, 2015.  Resp. Ex. 1-29, ECF No. 32.

This case was reassigned to me on October 19, 2015.  Notice of Reassignment, ECF No. 31.  A status conference was held on November 5, 2015, following which Petitioner was ordered to file a status report by November 20, 2015, indicating how she wished to proceed.  Order, issued Nov. 6, 2015, ECF No. 33.  On November 20, 2015, petitioner filed a status report requesting 60 days to file a supplemental expert report from Dr. Miller, which was granted.  Scheduling Order Non PDF, issued Nov. 20, 2015.  On January 19, 2016, petitioner filed Dr. Miller's supplemental expert report.  Pet. Ex. 15, ECF No. 35.

At a status conference held on February 9, 2016, in addition to my request for outstanding medical records for what appeared to be a hospitalization of T.F. noted in the record, petitioner requested a fact hearing to resolve the Table encephalopathy claim.  Order, issued Feb. 11, 2016, ECF No. 36.  Respondent's counsel was to file his supplemental expert report by March 25, 2016.  *Id*. at 2.

On March 10, 2016, petitioner filed a status report requesting that the fact hearing be held in Chicago, IL, and advising that T.F. had only had a bilirubin test during the time noted in record but was never hospitalized.  Pet. S. R., ECF No. 37.  On March 24, 2016, respondent submitted a supplemental expert report via compact disc.  Resp. Ex. E., ECF No. 38.

A status conference was held on April 28, 2016 to discuss potential hearing dates.  Petitioner was ordered to file a joint status report by May 31, 2016, providing the agreed upon hearing dates.  Order, issued April 28, 2016, ECF No. 39.  Petitioner filed a joint status report indicating the parties preferred hearing dates, and the undersigned set a factual hearing date for October 19-20, 2016, in Chicago IL.  Order, issued June 23, 2016, ECF No. 41.

In anticipation of the hearing, petitioner was ordered to file affidavits from individuals whom she expected to testify and all outstanding documents she intended to rely upon at the hearing.  Prehearing Order, issued June 23, 2016, ECF No. 42.  Petitioner submitted the affidavits of Brian Fic, Sr. (Pet. Ex. 16), Brian Fic, Jr. (Pet. Ex. 17), Joseph Fic (Pet. Ex. 18), Robert Fuhri (Pet. Ex. 19), Steven Fic, (Pet. Ex. 20), and Angelica Fic (Pet. Ex. 21).  ECF No. 46.

The hearing was held on October 19, 2016, in Chicago, IL.  Petitioner, Brian Fic, Sr., Brian Fic, Jr., Joseph Fic, and Steven Fic appeared in person and provided testimony.  No post-hearing briefs were necessary for a decision regarding the alleged Table encephalopathy.

This matter is now ripe for a ruling on petitioner's Table encephalopathy claim.

## II. The Factual Record

The hearing in this matter focused solely on the events immediately before and after T.F.'s November 29, 2012 vaccinations and whether T.F. suffered a Table encephalopathy. Therefore, the facts presented below will address only those events which are directly related to that aspect of petitioner's claim. This ruling should not be interpreted to mean that the remainder of the facts, medical history, affidavits and testimony are not important or are not being considered. Only the facts and evidence directly related to petitioner's Table encephalopathy claim are being addressed in this ruling.

### A.      Medical Record

While pregnant with T.F., Ms. Fuhri was on Levonox for deep vein thrombosis ("DVT"). She had a Greenfield filter.[5]  She had multiple ultrasounds throughout her pregnancy due to decreased amniotic fluid.  Pet. Ex. 3 at 72.  At thirty-six weeks, Ms. Fuhri switched from taking Levonox to Heparin in anticipation of induction.  *Id*.  She developed cellulitis at thirty-eight weeks.  *Id*.  Due to blood clotting problems, Ms. Fuhri was induced at thirty-nine weeks.  *Id*.

T.F. was born on September 28, 2012.  Pet. Ex. 1 at 1.  Upon delivery, T.F. required phototherapy due to hyperbilirubinemia.[6]  *Id*. at 4.  He received a Hepatitis B vaccine prior to being discharged from the hospital.  *Id*.  Ms. Fuhri stated that she took T.F. back to the hospital for a bilirubin check, however, there is no record of this visit.  *Id*. at 3.

T.F did not have a one-month well baby visit.  *Id*.  On November 29, 2012, T.F. was taken to Southwest Medical Associates for his two-month well baby check where he received the Pentacel [DTaP/IPV/Hib], Prevnar 13, and Hepatitis B vaccines.  *Id*. at 3.  Ms. Fuhri was advised to give T.F. Tylenol if needed.  *Id*. at 5.  She was also advised to change T.F.'s sleeping position due to "slight left occipital flattening."  *Id*.  T.F. was noted to be a well-baby.  *Id*.

On December 1, 2012, T.F. was brought by ambulance to the emergency room at Palos Community Hospital.  According to the Emergency Medical Squad who arrived at T.F.'s home

---

[5] Greenfield Filter is "a filter placed in the inferior vena cava under fluoroscopic guidance. It is used in patients who are particularly vulnerable to pulmonary embolism, such as those diagnosed with deep venous thrombosis with contraindications to anticoagulation, to prevent venous emboli from entering the pulmonary circulation." *Greenfield filter*, Farlex Partner Medical Dictionary 2012, http://medical-dictionary.thefreedictionary.com/Greenfield+filter (last visited Feb. 13, 2017).

[6] Hyperbilirubinemia is "an excess of BILIRUBIN in the blood, occurring as a result of liver or biliary tract dysfunction or with excessive destruction of red blood cells. It is classified as *conjugated* or *unconjugated,* according to the type of bilirubin present. Jaundice is manifested when excess bilirubin is deposited in the skin and mucous membranes." *Hyperbilirubinemia*, Farlex Partner Medical Dictionary 2012, http://medical-dictionary.thefreedictionary.com/hyperbilirubinemia (last visited Feb. 13, 2017).

that morning, the "[f]amily stated that they last saw [T.F.] awake and crying at 5:00 am." Pet. Ex. 2 at 8.  The emergency room physician stated that, according to Ms. Fuhri, T.F. "was last seen alive at 3 o'clock this morning.  [T.F.] recently had immunizations on Thursday.  [Ms. Fuhri] had been seeing Dr. Strambozi and [T.F.] has had a little bit of a fever.  Otherwise, he was acting normally and feeding well."  *Id*. at 17.

**B.     Investigation Report**

The Worth Police Department responded to T.F's home.  The narrative report of the responding police officer stated that Ms. Fuhri went to bed around 3:00 am.  Pet. Ex. 12 at 2. T.F. was already asleep in Ms. Fuhri's bed, and at that time, he was "'fine.'"  *Id*.  When she was asked if T.F. had any medical problems since birth, Ms. Fuhri stated that "he was jaundiced but suffered no other ailments."  *Id*.  Additionally, other family members who saw T.F. on November 30, 2012, advised the police that T.F. "appeared to be in good health."  *Id*. at 2-3.

**C.     Facts According to Family Members**

T.F. lived with his mother, Ms. Fuhri, father, Brian Fic, Sr. ("Mr. Fic"), and his half-brothers, Brian Fic, Jr. ("Brian") and Michael Fic ("Michael").  Robert Fuhri ("Robert"), Ms. Fuhri's brother, was also living with them.  Mr. Fic had two other children, Steven Fic ("Steven") and Angelica Fic ("Angelica") who visited their father every other weekend.  Pet. Ex. 16 at 1.  Below are the facts as told by each family member regarding the events that took place from November 29, 2012 through December 2, 2012.

1.      Facts according to Ms. Fuhri

Ms. Fuhri submitted an affidavit on December 15, 2014 in support of her petition; she also testified at the fact hearing on October 9, 2016.  Pet. Ex. 6; Tr. 5.17 to 57.17.  According to Ms. Fuhri, T.F. "was a happy, healthy, normally developing two-month old child before his vaccinations."  Pet. Ex. 6.  At the hearing, Ms. Fuhri testified that T.F was a typical baby.  She stated that when T.F. was awake, he appeared to be alert, however, because he was still so young, there wasn't really much of a reaction.  Tr. 10.18 to 13.17.

Ms. Fuhri testified that after the doctor's appointment on November 29, 2012, T.F. slept a lot but she thought that was usual after receiving vaccines.  Tr. 16.13 to 16.16.  Ms. Fuhri stated that she was told by the doctor that drowsiness and irritability might be a side effect of the vaccines.  Tr. 16.14 to 16.16.  That evening, T.F. seemed warm and uncomfortable, so Ms. Fuhri gave him a dose of infant's Tylenol per the doctor's recommendation.  Pet. Ex. 6 at 2; Tr. 16.25 to 17.3.

Ms. Fuhri testified that the next day, T.F. acted the same way as the day before; He slept a lot and did not wake for his feedings or to be changed.  She stated that she noticed T.F.'s face looked puffy so she took a picture of him on her phone and sent it to his dad, Mr. Fic, at work via text message.  Pet. Ex. 4 at 4; Tr. 17.4 to 17.10.  When she went to change T.F's diaper that morning, she stated that he let out a high-pitched scream.  Tr. 18.19 to 18.21.  To get him to calm down, she picked him up and comforted him.  Tr. 18.21 to 18.23.  When asked if she was

concerned about the scream, Ms. Fuhri responded: "Not really… maybe something startled him…" Tr. 19.2 to 19.4. Ms. Fuhri stated that she did not call or take T.F. to the doctor because the doctor had told her that T.F. might be tired cranky, irritable, and sleepy after receiving his shots, and if there was a fever, to give him Tylenol. Tr. 19.18 to 19.21. Ms. Fuhri stated that she gave T.F. Tylenol around 5:00 or 6:00 pm later that day. Tr. 19.10 to 19.21.

Ms. Fuhri stated that Steven and Angelica came over for their weekend visit that afternoon. Tr. 19.23 to 20.3. While she and Angelica were watching TV together she put T.F. in his swing after he had fallen asleep. Tr. 20.4 to 20.18. Ms. Fuhri stated she fell asleep as well watching TV. Tr. 20.17 to 20.18. She recalled Angelica waking her up and handing her T.F. Tr. 20.18 to 20.21. She noticed that Angelica had put a different outfit on T.F., and that the outfit was too big for him. Tr. 20.24 to 20.25. She noted that T.F.'s hands were cold. Tr. 21.2. She recalled going to her bedroom to change his outfit and put mittens on him so he wouldn't scratch his face. Tr. 21.3 to 21.12.

According to Ms. Fuhri, at around 2:30 am, she went into her bedroom with T.F. and put him on her bed and she laid down at an angle so that he could not move anywhere. Tr. 22.10 to 22.14. She recalled putting T.F. on a pillow, mostly his shoulders and head. Tr. 24.3 to 24.11. She noted that it was a regular flat pillow, not a "big, fluffy" one. Tr. 23.19 to 23.20. Ms. Fuhri stated that T.F. also had a blanket on him that she put up to his armpits but not past his neck. Tr. 24.18 to 24.22.

The next morning, Ms. Fuhri recalled waking up around 8:30 am. Pet. Ex. 6 at 3; Tr. 25.8. According to Ms. Fuhri, T.F. looked "really, really pale and his lips were blue." Tr. 25.9 to 25.10. She stated that he was in the same position on his back with the blanket still covering his body and his head and shoulders still on the pillow. Pet. Ex. 6 at 3; Tr. 25.11 to 25.19. At this point, Ms. Fuhri recalls yelling for Mr. Fic, who tried performing CPR. Pet. Ex. 6 at 3. Ms. Fuhri stated that she does not remember anything after that. Pet. Ex. 6 at 4; Tr. 26.7 to 26.5.

I questioned Ms. Fuhri further about what T.F. was like the day of November 30, 2012. Other than sleeping for most of the day, which she attributed to a typical reaction to the vaccines he received, she did not remember anything unusual that day. Tr. 36.3 to 36.23. The only thing that Ms. Fuhri recalled being unusual that day was when Angelica woke her to hand her T.F and his hand felt very cold. Tr. 54.10 to 54.12.

2.    Facts according to Brian Fic, Sr.

Mr. Fic is the father of T.F. He submitted an affidavit on October 6, 2016 and testified at the fact hearing on October 9, 2016. Pet. Ex. 16; Tr. 58.8 to 90.6. Mr. Fic typically worked the night shift 4:00 p.m. until approximately 2:30 a.m. unless he worked overtime, in which case he would work until almost 4:00 a.m. Pet. Ex. 16 at 1; Tr. 60.14 to 60.24.

Mr. Fic testified that T.F. was a happy baby, "smiling, playing, [and] making noises." Tr. 63.6 to 63.7. He recalled that T.F. was finicky or colicky early on. Tr. 63.1 to 63.2. Mr. Fic did not recall T.F. really focusing on anything yet nor did he recall T.F. having a favorite toy. Tr. 81.16 to 82.9. Mr. Fic noted that T.F. spent a lot of time in his swing and would often sleep

there.  Tr. 63.22 to 63.23.   He stated that although T.F. had a crib in their bedroom, he normally slept in the bed with Ms. Fuhri and usually slept on his back.  Tr. 64.1 to 64.13.

Mr. Fic testified that on November 29, 2012, he left for work before Ms. Fuhri brought T.F. home from the doctor.  Pet. Ex. 16 at 2; Tr. 65.7 to 65.9.  Mr. Fic further stated that he did not recall seeing T.F. the following day before he left for work.  Pet. Ex. 16 at 2; Tr. 65.16 to 65.20.  He did recall that Ms. Fuhri told him about the vaccines T.F. had received the day before, and that T.F. had screamed when the shots were given to him.  Tr. 79.16 to 79.21.  Mr. Fic stated that he thought it would be normal for children to scream getting shots.  Tr. 80.20 to 80.22.  Mr. Fic did not remember Ms. Fuhri texting him a photo of T.F. on November 30, 2012.  Pet. Ex. 6 at 2; Tr. 85.9 to 85.17.  The only photo he remembered receiving was one of T.F. that was taken in the doctor's office at his checkup.  When he was shown the photo that Ms. Fuhri referred to as the one that she sent to him on November 30, 2012, he stated that he did not recall seeing that photo.  Pet. Ex. 4 at 4; Tr. 85.9 to 86.20.  Mr. Fic testified that he did not recall anything out of the ordinary on November 30, 2012.  Tr. 86.21 to 87.25.

Mr. Fic recalled that he arrived home around 5:00 a.m. on December 1, 2012.  Pet. Ex. 16 at 2; Tr. 67.12 to 67.13.  When he went into the bedroom to change, T.F. and Ms. Fuhri were sleeping in the bed, with Ms. Fuhri sleeping at an angle and T.F. sleeping on a pillow on his back in front of her.  Pet. Ex. 16 at 2; Tr. 67.20 to 68.24.  Mr. Fic recalled hearing T.F. "exhale" and "tuck[ing] him in before [he] left the room" to watch television in the living room, where he fell asleep.  Tr. 69.18 to 70.17.  Mr. Fic stated that nothing struck him as unusual.  Tr. 70.3.

Mr. Fic recalled waking to Ms. Fuhri screaming.  He recalled running into the bedroom to find Ms. Fuhri sitting in bed with T.F. lying on his back in front of her.  Pet. Ex. 16 at 2; Tr. 70.19 to 71.17.  Mr. Fic testified that he first picked up T.F. to check his airway and to make sure there was nothing in his mouth.  Tr. 71.6 to 71.8.  After finding no pulse, Mr. Fic stated that he performed CPR.  Pet. Ex. 16 at 2; Tr. 71.25.

3.     Facts according to Joseph Fic

Joseph is Mr. Fic's brother and T.F.'s uncle.  Joseph submitted an affidavit on October 6, 2016 and testified at the fact hearing on October 9, 2016.  Pet. Ex. 18; Tr. 90.11 to 105.2.  Joseph testified that he lived with Ms. Fuhri and Mr. Fic when T.F. was born.  Pet. Ex. 18; Tr. 91.14 to 92.1.  He worked for UPS and regularly did the early morning shifts; therefore, he stated that he was around the house a lot with Ms. Fuhri and T.F. during the day and helped out when Ms. Fuhri needed a break.  Pet. Ex. 18 at 1; Tr. 92.1 to 20.7.  Joseph recalled T.F. being a happy, normal baby.  Pet. Ex. 18 at 1; Tr. 93.18 to 93.20.  He stated that when Ms. Fuhri brought T.F. home after he received his vaccines on November 29, 2012, T.F. seemed tired and slept a lot.  Pet. Ex. 18 at 1; Tr. 95.35 to 96.11.  According to Joseph, T.F. would open his eyes, smile a bit and then go back to sleep.  Joseph stated that T.F. was not his usual self.  Tr. 95.14 to 96.7.

Joseph recalled that T.F. slept for most of the day on November 30, 2012.  Pet. Ex. 18 at 2; Tr. 96.17 to 97.16.  He stated that he played with T.F. sometime that evening and recalled that he smiled a bit then went back to sleep.  *Id*.  Joseph estimated that he played with T.F. for about thirty minutes, pushing him in his swing, trying to get him to smile, but that he would just go

back to sleep.  Tr. 97.10 to 97.12.  Joseph stated that he went to bed at around 1:30 a.m. and woke up for work the next morning about twenty minutes before Ms. Fuhri began screaming that something was wrong with T.F.  Pet. Ex.18 at 2; Tr. 97.23 to 98.24.  He stated that he hurried downstairs and saw Mr. Fic performing CPR on T.F.  Pet. Ex. 18 at 2; Tr. 97.23 to 98.24.

4.      Facts according to Steven Fic

Steven is Mr. Fic's son and T.F.'s half-brother.  Steven submitted an affidavit on October 6, 2016 and testified at the fact hearing on October 9, 2016.  Pet. Ex. 20; Tr. 105.6 to 113.9.  Steven and his sister Angelica lived with their mother, but visited Mr. Fic and Ms. Fuhri every other weekend.  Pet. Ex. 20 at 1; Tr. 106.7 to 106.11.  He recalled T.F. as "being a happy, normal baby" and remembered interacting with him on the weekends when he would be at his father's house.  Pet. Ex. 20 at 1; Tr. 107.18 to 108.1.  He recalled arriving at Mr. Fic's house at around 4:00 or 5:00 p.m. on November 30, 2012.  Tr. 108.13.  According to Steven, T.F. was sleeping in his swing in the living room when he arrived.  Pet. Ex. 20 at 2; Tr. 108.14 to 108.24.  Steven stated that he did not remember much else about that evening.  Pet. Ex. 20 at 2.

5.      Facts according to Angelica Fic

Angelica is Mr. Fic's daughter and T.F.'s half-sister.  Angelica submitted an affidavit on October 6, 2016 but did not testify at the fact hearing.  Pet. Ex. 21.  In her affidavit, Angelica stated that she arrived at her father's house sometime in the afternoon on November 30, 2012 and T.F was sleeping in his swing when she arrived.  Pet. Ex. 21 at 1-2.  Angelica affirmed that later in the evening, both Ms. Fuhri and T.F., who was in his swing, were asleep in the living room.  *Id.*  She stated that T.F. woke up and was fussing, so she woke up Ms. Fuhri and then went upstairs.  *Id.*  Overall, she "didn't notice anything different or usual [sic] about [T.F.] that night."  *Id.*

6.      Facts according to Brian Fic, Jr.

Brian is Mr. Fic's son and T.F.'s half-brother.  Brian lived with Mr. Fic and Ms. Fuhri on November 30, 2012.  Brian submitted an affidavit on October 6, 2016 but did not testify at the fact hearing.  Pet. Ex. 17.  Brian recalled T.F. as "being a happy, healthy, normal baby before he died."  Pet. Ex. 17 at 1.  He recalled seeing T.F. the night before he died around 12:00 a.m.  *Id.*  Brian stated that he and Joseph played with T.F. for a few minutes before going to bed.  *Id.*  Brian recalled that T.F. smiled but did not seem to notice as much as he usually would.  *Id.* at 2.  Brian stated that he did not remember much else that was different about T.F. that night.  *Id.*

7.      Facts according to Robert Fuhri

Robert is Ms. Fuhri's brother and T.F.'s uncle.  He lived with Mr. Fic and Ms. Fuhri on November 30, 2012.  Robert submitted an affidavit on October 6, 2016 but did not testify at the fact hearing.  Pet. Ex. 19.  Robert recalled T.F. as "being a happy, normal baby before he died.  Pet. Ex. 19 at 1.  Robert further stated that he did not recall anything about the day before T.F. died.  *Id.*

### III.  Legal Standard

**A.      Claimant's Burden in Vaccine Program Cases**

To receive compensation under the Vaccine Act, petitioner must prove either: (1) that T.F. suffered a "Table Injury" – i.e., an injury falling within the Vaccine Injury Table – corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that T.F.'s illnesses were actually caused by a vaccine ("Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)( 1 )(C)(ii)(I); *see also Moberly v. Sec'y of Health & Human Servs.,* 592 F.3d 1315, 1321 n.2 (Fed. Cir. 2010) (citations omitted).

Petitioners bear the burden of establishing their claims by a preponderance of the evidence.  42 U.S.C. § 300aa-13(1)(a).  A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the judge of the fact's existence."  *Moberly*, 440 F.3d 1317 at 1322 n.2 (citations omitted).  Causation is presumed after a Table's factual predicates are established, therefore, the definition of encephalopathy is deemed "very restrictive" under the Vaccine Table.  *Dixon v. Sec'y of Health & Human Servs.,* No. 01-605V, 2003 WL 23218020, at (Fed. Cl. Spec. Mstr. Nov. 25, 2003), *mot. for review den'd,* 61 Fed. Cl. 1 (2004).

"In determining whether or not an encephalopathy is a condition set forth in the Table, the Court shall consider the entire medical record." § 100.3(b)(2)(iv).  A special master may consider all the evidence presented, including that of respondent, in determining whether petitioners have met their burden of proof.  *See Doe 11 v. Sec'y. of Health and Human Servs,* 601 F.3d 1349, 1357–58 (Fed. Cir. 2010).

**B.      Legal Standards Regarding Fact Finding**

The process for making determinations in Vaccine Program cases regarding factual issues, begins with analyzing the medical records, which are required to be filed with the petition.  42 U.S.C. § 300aa-11(c)(2).  Medical records, created contemporaneously with the events they describe are presumed to be accurate and "complete" (i.e., presenting all relevant information on a patient's health problems). *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *Doe/70 v. Sec'y of Health & Human Servs.,* 95 Fed. Cl. 598, 608 (2010).

Where medical records are clear, consistent and complete, they should be afforded substantial weight.  *Lowrie v. Sec'y of Health & Human Servs.,* No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).  Indeed, contemporaneous medical records are generally found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence.  *Cucuras*, 993 F. 2d at 1528; *see also Murphy v. Sec'y of Health and Human Servs.,* 23 Cl. Ct. 726, 733 (1991), *aff'd,* 968 F. 2d 1226 (Fed. Cir.) (citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 396 (1947)("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is

entitled to little evidentiary weight"). In making contemporaneous reports, the declarant's motivation for accurate explication of symptoms is more immediate, as opposed to testimony offered after the events in question, which is considered inherently less reliable. *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993).

There are situations in which compelling oral testimony may be more persuasive than written records—for instance in cases where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health &Human Servs.*, 69 Fed. Cl. 775, 779 (2006)("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); *Lowrie*, 2005 WL. 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent")(quoting *Murphy v. Sec'y of Health & Human Servs.,* 23 Cl. Ct. 726, 733 (1991), *aff'd per curium,* 968 F. 2d 1226 (Fed. Cir. 1992). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu v. Sec'y of Health & Human Servs.*, 569 F. 3d. 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.,* 991 F. 2d. 1570, 1575 (Fed. Cir. 1993).

In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed Cl. 184, 203-204 (2013), *aff'd,* 746 F. 3d. 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns by Burns v. Sec'y of Health & Human Servs.,* 3 F. 3d 415, 417 (Fed. Cir. 1993).

## C.    Encephalopathy Table Claim

To prove a Table injury, petitioner must show that T.F. suffered an injury listed on the Vaccine Injury Table and that such injury first manifested within the period listed on the Table. *Shalala v. Whitecotton,* 514 U.S. at 274 (citing § 300aa–11(c)(1)(C)(i)); 42 U.S.C. § 300aa–14(a). The current version of the table is found at 42 C.F.R. § 100.3(a). The Vaccine Act's qualifications and aids to interpretation ("QAI"), 42 C.F.R. § 100.3(b), contain definitions for the terms used in the table. *See Althen v. Sec'y of Health and Human Servs.*, 58 Fed. Cl. 270, 280 (2005), *aff'd* 418 F. 3d. 1274 (Fed. Cir. 2005) (noting that the QAI should be used to interpret key terms found in the Table).

Petitioner alleges that T.F. suffered from the Table injury, encephalopathy within 24 hours of receiving his DTaP vaccine. The QAI defines "acute encephalopathy" to mean "one that is sufficiently severe so as to require hospitalization (whether or not hospitalization occurred." 42 C.F.R. § 100.3(b)(2)(i). For children who are less than 18 months of age,

10

including T.F., "an acute encephalopathy is indicated by a significantly decreased level of consciousness lasting for at least 24 hours." 42 C.F.R. § 100.3(b)(2)(i)(A).   The definition of the phrase "significantly decreased level of consciousness" is found in paragraph D, which states:

> A "significantly decreased level of consciousness" is indicated by at least one of the following clinical signs for at least 24 hours or greater (see paragraphs (2)(i)(A) and (2)(i)(B) of this section for applicable time frames.
>
> > (1) Decreased or absent response to environment (response, if at all, only to loud voice or painful stimuli);
> > (2) Decreased or absent eye contact (does not fix gaze upon family members or other individuals); or
> > (3) Inconsistent or absent responses to external stimuli (does not recognize familiar people or things.)

42 C.F.R. § 100.3(b)(2)(i)(D); *see also Waddell*, 2012 WL 4829291, at 7 (holding that the QAI definition of "significantly decreased level of consciousness" implies "a state of diminished alertness that is much more than mere sleepiness or inattentiveness…[It] requires markedly impaired – or strikingly absent – responsiveness to environmental or external stimuli for a sustained period of at least twenty-four hours.")

The following has been excluded as factors contributing to an "encephalopathy."

> The following clinical features alone, or in combination, do not demonstrate an acute encephalopathy or a significant change in either mental status or level of consciousness as described above: Sleepiness, irritability (fussiness), high-pitched and unusual screaming, persistent inconsolable crying and bulging fontanelle. Seizures in themselves are not sufficient to constitute a diagnosis of encephalopathy.  In the absence of other evidence of an acute encephalopathy, seizures shall not be viewed as the first symptom or manifestation of the onset of an acute encephalopathy.

42 C.F.R. § 100.3(b)(2)(i)( E), *see also Watt v. Sec'y. of Health and Human Servs.* No. 99-25V, 2001 WL 166636, at 8 (Fed. Cl. Spec. Mstr. Jan. 26, 2001) (explaining that a Table encephalopathy "cannot merely be crying" and "it cannot merely be crankiness").

## IV. Discussion and Findings of Fact

A fact hearing was held because the parties disagreed about T.F.'s health after his vaccinations and prior to his death on December 1, 2012.  There is no disagreement that T.F. was a healthy baby at his two-month check up on November 29, 2012.  Therefore, the issue requiring analysis here is T.F.'s health between the afternoon of November 29, 2012, following receipt of his vaccination and the time of his death on December 1, 2012.

In this matter, there are only two relevant records: the Palos Community Hospital record and the Worth Police Department investigation report prepared shortly after T.F.'s death.

The hospital record provides that T.F. "is a 2-month-old child who was found unresponsive around 8:45 this morning and brought in by paramedics pulseless and apneic…According to the mother, [T.F.] was last seen alive at 3 o'clock this morning.  The child recently had immunizations on Thursday.  She had been seeing Dr. Strambozi and [T.F.] has has a little bit of a fever.  Otherwise, he was acting normally and feeding well.   Normal birth history.  He was a little jaundiced at birth but went home with the mother about 2 months ago."  Pet. Ex. 2 at 17.

The initial police investigation states that, according to Ms. Fuhri, T.F. had a doctor's examination on November 29, 2012.  He received three immunizations in his left leg.  Redness to the left leg was noted on Friday November 30, 2012.  She gave him Tylenol on November 29, 2012 after the examination for low fever and for pain and again on November 30, 2012 at 8 p.m. for pain.  Ms. Fuhri advised that T.F. drank formula and consumed 6 to 8 ounces per feeding.  Pet. Ex 12 at 11.  Ms. Fuhri stated that she went to bed about 3 a.m.  T.F. was already in bed sleeping and he was "fine."  Pet. Ex. 12 at 2.

Mr. Fic advised that he arrived home from work at about 4 a.m. on December 1, 2012.  He stated that when he went to change in his room, he saw Ms. Fuhri and T.F. sleeping in the bed.  Mr. Fic related that T.F. was sleeping but "moving around and grunting."  Pet. Ex. 12 at 2.  Joseph, Robert, Angelica and Steven all stated that they had seen T.F., the night before at some point and that he "appeared to be in good health."  Pet. Ex. 12 at 2.  Brian stated that he saw T.F. at around midnight in the living room and he "appeared to be in good health.  Pet. Ex. 12 at 3.

Michael Fic, who also resided in the Fuhri/Fic home at the time, did not submit an affidavit or testify at the hearing.  When questioned by the police, Michael stated that nothing unusual occurred within the residence on Friday, November 30, 2012 and that T.F. appeared to be in good health.  Michael stated that he saw T.F. asleep in his swing in the living room at around 5 p.m.  He then went to his room and came downstairs for something to eat at around midnight.  When he was downstairs, he noticed that T.F. was up in his swing and that Joe and Brian were in the living room playing with him.  Pet. Ex. 12 at 5 to 6; Pet. Ex. 12 at 9.

At the hearing, Ms. Fuhri testified that on November 29, 2012 and November 30, 2012, T.F. slept a lot and did not wake for feedings.  She stated that his face looked puffy.  Tr. 17.4 to 17.10.  Pet. Ex. 4 at 4.  Ms. Fuhri further stated that while changing T.F.'s diaper on November 30, 2012, he let out a high-pitched scream.  She comforted him until he settled down.  Tr. 18.19 to 18.23.  However, she stated that she was not concerned about him, thought his cry was due to something startling him and his sleeping more than usual was typical and to be expected.  Tr. 19.2 to 19.4.  She stated that she did not call or take T.F. to the doctor because the doctor had told her what to expect, that T.F. may be tired, cranky and irritable.  Tr. 19.18 to 19.21.

When I questioned Ms. Fuhri further about what T.F. was like the day of November 30, 2012, other than being sleepy for most of the day, which she attributed to a typical reaction to the vaccines he received, Ms. Fuhri did not recall anything unusual about T.F.  Tr. 36.3 to 36.23.

12

The only thing that Ms. Fuhri recalled being unusual that day was when Angelica woke her to hand her T.F and his hand was very cold.  Tr. 54.10 to 54.12.

Joseph recalled T.F. being tired, sleeping a lot and not being his normal self after his vaccinations.  Pet. Ex. 18 at 1; Tr. 95.14 to 96.11.  However, he did recall playing with T.F. sometime during the evening on November 30, 2012 and that T.F. smiled a bit then went back to sleep.  Pet. Ex. 18 at 2; Tr. 96.17 to 97.19.  Joseph estimated that he played with T.F. for about thirty minutes.  Tr. 97.10 to 97.12.  The remainder of the family members who testified or submitted affidavits, or both, did not remember anything unusual about T.F. on November 30, 2012.

The facts as developed at hearing suggest that T.F. may have slept more than usual following receipt of his vaccines on November 29, 2012.  However, there was no evidence in the record that would establish the requirements for a Table encephalopathy.  T.F.'s behavior did not alarm those around him, nor did it prompt a need for a phone call to the doctor.  There appeared to be nothing unusual on November 29, 2012 or November 30, 2012, to anyone in the household, other than T.F. sleeping more than usual.  The facts and evidence in this case are insufficient to establish that T.F. suffered a Table encephalopathy following receipt of his DTaP or other vaccines on November 29, 2012.

The loss of T.F. is a tragedy to this family.  However, constrained by the QAI definition of acute encephalopathy and "significantly decreased level of consciousness" which implies "a state of diminished alertness that is much more than mere sleepiness or inattentiveness…[It] requires markedly impaired – or strikingly absent – responsiveness to environmental or external stimuli for a sustained period of at least twenty-four hours", I must find that T.F. did not suffer a Table encephalopathy following his vaccinations on November 29, 2012.

### V. Conclusion

I have carefully reviewed the record and considered all of the evidence submitted in support of petitioner's claim that T.F suffered from a Table encephalopathy following his vaccinations on November 29, 2012.  I find that T.F. did not suffer from a Table encephalopathy following his vaccinations and therefore, petitioner is not entitled to compensation for T.F's death on her Table injury claim.

The following is therefore ORDERED:

**By no later than Monday, June 5, 2017, petitioner must file a status report updating the court on how she would like to proceed**.

**IT IS SO ORDERED.**

<u>s/Mindy Michaels Roth</u>
Mindy Michaels Roth
Special Master